Varnall WEEKS, Petitioner–Appellant,

v.

Ronald E. JONES, Commissioner of Corrections, Respondent–Appellee.

No. 95–6386.

United States Court of Appeals, Eleventh Circuit.

May 11, 1995.

Barry J. Fisher, Southern Prisoners Defense Committee, Steve Bright, Atlanta, GA, James C. McMillin, New York City, for appellant.

Jeff Sessions, Atty. Gen., State of Alabama, J. Clayton Crenshaw, Montgomery, AL, for appellee.

Before KRAVITCH, COX and BIRCH, Circuit Judges.

BIRCH, Circuit Judge:

This habeas case is before us for the second time. Petitioner requests emergency stay of execution and certificate of probable cause. We DENY

## I. RELEVANT BACKGROUND

Varnall Weeks was sentenced to death for his October 1, 1981, killing of Mark Anthony Batts, a Tuskegee Institute veterinary student.[1] We affirmed the district court's denial of Weeks's first petition for habeas corpus relief pursuant to 28 U.S.C. § 2254, and the Supreme Court denied certiorari review on February 27, 1995. *Weeks v. Jones,* 26 F.3d 1030 (11th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1258, 131 L.Ed.2d 137 (1995). On subsequent motion by the State of Alabama for an execution date, the Alabama Supreme Court set May 12, 1995, as Weeks's execution date.

Weeks then filed a petition for state collateral relief with the Circuit Court of Macon County. In that petition, Weeks asserted that he was incompetent to be executed under *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (plurality opinion), and that he was entitled to an evidentiary hearing on this claim. On April 7 and 14, 1995, the Macon County Circuit Court conducted a thorough evidentiary hearing, including psychiatric testimony from examining experts for Weeks and the state.[2] The judge also questioned Weeks directly. In a comprehensive order, which we attach hereto as Appendix I,[3] that court concluded that Weeks was competent to be executed and denied relief.

Weeks next moved for a temporary stay of execution in the Alabama Court of Criminal Appeals, which dismissed his appeal and denied his motion for a stay of execution on May 4, 1995. Weeks's petition for certiorari to the Alabama Supreme Court was denied on May 9, 1995. Weeks then filed his second petition for habeas corpus relief in the Middle District of Alabama. In denying habeas relief and a stay of execution, the district court found that the state evidentiary hearing was all-inclusive for Weeks: "In short, the state trial court did everything it could to insure that it was fully informed of every conceivable fact, no matter how trivial or redundant, that might possibly have some bearing on the question of whether Weeks is competent to be executed." *Weeks v. Jones,* No. 95V–613–N, at 7–8 (M.D.Ala. May 10, 1995). The district court also denied Weeks's application for a certificate of probable cause. On May 11, 1995, Weeks moved for an emergency stay of execution and a certificate of probable cause. His execution currently is scheduled for 12:01 A.M. on May 12, 1995.

## II. DISCUSSION

In his emergency motion for stay of execution and certificate of probable cause, Weeks raises four issues.[4] We address Weeks's Sixth Amendment ineffective assistance of counsel claim as a successive claim or abuse of the writ. We consider his competency to be executed claim separately; we do not address his remaining two claims because they are meritless.

### A. *Successive Petition*

 Rule 9(b) of the Rules Governing Section 2254 Cases provides that a second or

---

1. We detailed the facts of the murder and the prior procedural history in our previous opinion, *Weeks v. Jones,* 26 F.3d 1030, 1032–33 (11th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1258, 131 L.Ed.2d 137 (1995).

2. The trial court heard the testimony of six mental health expert witnesses; five testified on behalf of Weeks and one testified for the state.

3. We attach the state trial court's order for convenient reference as to the *factual* findings concerning Weeks's competency to be executed.

While we find that court's ultimate conclusion that Weeks is competent to be executed is supported by the record, we need not formulate a circuit standard for determining competency to be executed to decide the pending application.

4. Weeks raises an Eighth Amendment cruel and unusual punishment, competency to be executed claim. In conjunction with that claim, he also raises Fourteenth Amendment equal protection and due process claims. His fourth claim is his Sixth Amendment ineffective assistance of counsel claim.

successive petition alleging new grounds of relief may be dismissed if the petitioner's "reasonable and diligent investigation" would have enabled him to present these grounds in a previous habeas petition. *McCleskey v. Zant,* 499 U.S. 467, 498, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517 (1991). Under *McCleskey,* an abuse of the writ will not be excused unless the petitioner can show cause for failing to raise the claim earlier and prejudice resulting therefrom. *Id.* at 494, 111 S.Ct. at 1470; *see also id.* at 497, 111 S.Ct. at 1472 ("This ruling on the merits cannot come before us or any federal court if it is premised on a claim that constitutes an abuse of the writ."). Since the state has raised abuse of the writ, the burden of proving that there has been no abuse shifts to the petitioner. *Burger v. Zant,* 984 F.2d 1129, 1132 (11th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 141, 126 L.Ed.2d 104 (1993). Petitioner may meet this burden by showing that he did not deliberately abandon the claim, his failure to raise it was not because of inexcusable neglect, and he had a justifiable reason for omitting the claim in an earlier petition. *Id.* at 1132–33. We gave the example of newly discovered evidence that was not available at the time of the original filing as sufficient to overcome petitioner's burden. *Id.* at 1133; *see Alderman v. Zant,* 22 F.3d 1541, 1551–52 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994) (" '[C]ause ... requires a showing of some external impediment *preventing* counsel from constructing or raising the claim.' " (quoting *McCleskey,* 499 U.S. at 497, 111 S.Ct. at 1472)). Weeks has not met this burden. Accordingly, we find the ineffective assistance of counsel claim to be successive and to constitute abuse of the writ.

## B. Competency to be Executed

■ We issue a certificate of probable cause only if the petitioner can make a substantial showing of the denial of a federal right. *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). While Weeks need not demonstrate that he would prevail on the merits under this standard, he is required to show that the issue is debatable among jurists of reason. *Id.* at 893 n. 4, 103 S.Ct. at 3395 n. 4; *Richardson*

*v. Thigpen,* 883 F.2d 895, 897 (11th Cir.) (per curiam), *cert. denied,* 492 U.S. 934, 110 S.Ct. 17, 106 L.Ed.2d 631 (1989). Essentially, this standard also applies to an application for stay of execution. *Delo v. Stokes,* 495 U.S. 320, 321, 110 S.Ct. 1880, 1881, 109 L.Ed.2d 325 (1990); *Fleming v. Kemp,* 794 F.2d 1478, 1481 (11th Cir.1986).

Weeks argues that he is incompetent to be executed under *Ford.* He further contends that the state trial court's finding that he is competent to be executed is not entitled to a "presumption of correctness" in federal court under 28 U.S.C. § 2254(d) because the state trial court did not accord him a "full and fair" hearing and used the incorrect standard to assess his competency to be executed. Under section 2254(d), federal habeas courts are directed to presume the correctness of a state court's determination of a factual issue. *Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *Bolender v. Singletary,* 16 F.3d 1547, 1552 n. 1 (11th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 589, 130 L.Ed.2d 502 (1994); *Bush v. Singletary,* 988 F.2d 1082, 1087 (11th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 705, 126 L.Ed.2d 704 (1994).

Weeks's contention that his evidentiary hearing was not full and fair is based solely on the trial judge's questioning of Weeks without an opportunity for his counsel to ask responsive questions. We find this argument to be invalid. The trial judge repeatedly stated that his questioning of Weeks was for the purpose of gaining insight into his mental processes, trying to determine how his mind was operating, and "probing into his mind and how he views the world and what he knows and ·[ ] how he perceives things." Competency Hearing at 73; *accord id.* at 75, 83, 84, 94, 165, 171, 207, 247, 261, 338, 385–86, 425, 466, 468, 491. He specifically noted that he was not questioning Weeks and taking his answers at face value: "It's not so much as what's being said but what is being meant." *Id.* at 77. Further, the trial judge noted that "[t]here are much larger ... questions as to mental status examination that go from anything about subtlety about a person's physical appearance to subtleties of their thought

processes to issues of how they perceived certain events in their life." *Id.* at 152.

While the trial judge gave Weeks every opportunity to present all of the witnesses and evidence that he desired, the judge ultimately had to determine Weeks's competency to be executed. We are impressed by his active intervention in questioning Weeks directly to assist him in making this determination. Weeks has not suggested any responsive questions that his counsel would or could have asked following the judge's questioning of Weeks. The purpose of the judge's specific questioning was to clarify aspects of Weeks's competency so that the judge would have a more comprehensive basis for making the competency determination. As the trial judge's order demonstrates, his factual conclusions are based completely on the evidence and the testimony presented at the evidentiary hearing as well as the judge's personal, unsworn exchange with Weeks.

Based on its findings at the evidentiary hearing, the state court made a factual determination that Weeks was competent to be executed. *Cf. United States v. Hogan,* 986 F.2d 1364, 1371 (11th Cir.1993) ("[A] state court's conclusion that a defendant is competent to stand trial is a factfinding for habeas review purposes...."). The state judge used the standard of competency to be executed enunciated by the American Bar Association ("ABA"). Appendix at 1568 (quoting Std. 7.5–6, *American Bar Assoc. Crim. Just. Mental Health Stds.).* While our circuit has not articulated a standard as to competency to be executed under *Ford,* we need not determine this issue to decide Weeks's emergency motion for stay of execution and certificate of probable cause. Whatever the standard is, it is no higher than the ABA standard advanced by Weeks and used by the state trial judge. *See Martin v. Dugger,* 686

F.Supp. 1523, 1572 (S.D.Fla.1988) (while opinions and recommendations by mental health experts may be helpful in making the competency determination, they "serve only as recommendations in making the final judgment").

### III. CONCLUSION

We conclude that the issues raised by Weeks are not debatable among jurists of reason and could not be resolved differently. Therefore, these issues do not deserve further review by this court. Accordingly, we DENY Weeks's emergency motion for stay of execution and certificate of probable cause.

### APPENDIX

### IN THE CIRCUIT COURT OF MACON COUNTY, ALABAMA

### STATE OF ALABAMA

### VS.

### VARNALL WEEKS

### CASE NO. CC–82–042.

*ORDER DENYING PETITION FOR RELIEF FROM SENTENCE OF DEATH ON GROUNDS OF MENTAL INCOMPETENCY TO BE EXECUTED*

This matter first came on for consideration on the 7th day of April, 1995. The Defendant was present in Court and represented by Honorable Barry Fisher and Honorable James McMillan, both of whom were also present. The hearing occupied the entire day, but the Court was not able to conclude the matter at that time for several reasons. At the close of business on April 7, 1995, the Court continued the remainder of the hearing to April 14, 1995.[1]

---

1. The reasons for the continuance were as follows: 1) The defense presented competent evidence that the Defendant suffers from a severe mental disorder. Therefore, the Court deemed it appropriate to allow the examination of the Defendant by experts suggested by defense counsel. Specifically, the Court allowed examination of the Defendant by Drs. Robert Dennis Lyman and Barry F. Scanlon at Holman Prison during the ensuing week. 2) The Court deemed it appropriate to have the Defendant physically present be-

fore the Court on two separate occasions several days apart because of the alleged episodic nature of the Defendant's mental disorder. 3) By continuing the case for one week, the conclusion of the hearing was conducted seven days later and within thirty days of the scheduled execution date in this case. Defense had objected that the hearing was being conducted too early. 4) The undersigned Judge needed additional time to study the legal issues involved in this matter and made use of the one-week delay to achieve a

The Court entered an interim Order on April 7, 1995, which, among other things, tentatively adopted the legal standard to be applied in the determination of whether the defendant is incompetent to be executed. The Order also directed certain procedural and administrative aspects of the hearing.

The hearing was resumed on the 14th day of April, 1995. The Defendant was present in Court and represented by Honorable Barry Fisher and Honorable James McMillan, both of whom were present. The State was represented on April 14, 1995, by Honorable Clay Crenshaw, Honorable Andy Poole, and Honorable Michael Billings.

*PRELIMINARY ADMINISTRATIVE MATTERS:* The Court took steps to assure that defense was enabled to present all relevant evidence. At the outset of the hearing on April 14, 1995, counsel for the Defendant pointed out to the Court that a subpoena had not been served on Dr. Blaine Crum and that Dr. Crum was not present in Court. The undersigned Judge contacted Dr. Crum's office by telephone and requested that he immediately come to the Macon County Courthouse at Tuskegee, Alabama, for the hearing. Dr. Crum willingly agreed to comply with the Court's request.

Defense counsel also pointed out that Dr. Joseph Thomas was not present in Court although he had been served with a subpoena. The Court contacted Dr. Thomas through his office and ordered that he immediately drive from Mobile to Tuskegee for the hearing. Both office personnel and Dr. Thomas protested, 1) that because he had not seen the Defendant since January, 1995, someone else should present the testimony and 2) that the subpoena which was served upon Dr. Thomas was not signed by a judge. The Court was particularly interested in Dr. Thomas' testimony because of his strongly worded affidavit presented by defense counsel and had directed the issuance of a subpoena to Dr. Thomas on April 7, 1995. The Court assured Dr. Thomas that all medical personnel trained in mental health who had seen or treated the Defendant in recent years were testifying in the proceeding and further explained that subpoenas are not signed by the judge but by the clerk. The Court warned that a writ of arrest would be issued for Dr. Thomas if he refused to obey the subpoena. Dr. Thomas did not agree immediately to comply with the subpoena, and the Court did in fact issue a writ of arrest for Dr. Thomas. At approximately noon, Dr. Thomas' office called and indicated that he would voluntarily appear and that he was leaving Mobile at that time. The Court set aside the writ of arrest and so notified all necessary law enforcement officials.

*PRELIMINARY PROCEDURAL MOTIONS AND EVIDENTIARY MATTERS:* The Court overruled the State's Motion to Reconsider the Legal Standard to be Applied in a hearing to determine incompetency to be executed. This Order contains an in-depth discussion of the legal issue surrounding the legal standard to be applied in this case.

The Court denied a Motion filed on behalf of the Alabama Board of Pardons and Paroles to quash a subpoena for production of certain records. It was ordered that the Board of Pardons and Paroles forward directly to the Court any and all records. During the course of the hearing, the records were in fact presented and delivered to defense counsel.

On motion of defense counsel, it was also ordered that Holman Prison produce any and all medical records in its possession with regard to the Defendant, which records have not previously been produced by the Department of Corrections. Any such records from Holman Prison are to be forwarded directly to the Court.

*COMPLETION OF EVIDENTIARY HEARING:* After dealing with the foregoing preliminary matters, the Court heard all remaining evidence. The Court heard additional testimony from Dr. Robert Dennis Lyman, Dr. Barry F. Scanlon, and Dr. Harry McClaren, who had testified on April 7, 1995. The Court also heard testimony from Dr. Gail Williams, Dr. Blaine Crum, and Dr. Joseph Thomas. Dr. McClaren was the sole expert called by the State. The Court devoted deeper understanding of the issue of incompetency to be executed.

ed considerable time to hearing evidence in connection with this motion. The hearing on April 7, 1995, lasted from 9:00 a.m. to approximately 7:00 p.m., with a short recess for lunch. The hearing on April 14, 1995, likewise lasted from 9:00 a.m. to approximately 7:00 p.m., with a short recess for lunch. The court believes that all relevant testimony bearing on the issues was presented during the two-day hearing. In addition to reviewing briefs and arguments of the parties, the Court has conducted independent research of the legal issue involved in this matter.[2]

*STATUS OF CASE:* For the purpose of this Order, it is sufficient to say that the Supreme Court of Alabama has set the date of May 12, 1995, for execution of the Defendant. The Defendant was found guilty by a jury and waived the right to have the jury recommend a sentence. The sentence phase was decided by the judge without a jury. Defendant was sentenced to death by Judge William I. Byrd on the 23rd day of June, 1982. The case has been involved in appeals, collateral attacks, writs of certiorari, and all the usual procedures since that time.[3] Without attempting to second-guess what any other Court may do, it appears to this Court that the Defendant has exhausted all appeals and is now due to be executed, unless he is incompetent to be executed. The sole issue before this Court for decision is the alleged incompetency of the defendant. All other matters are procedurally barred.[4]

This Petition for Relief from Sentence of Death on Grounds of Mental Incompetency to be Executed was filed pursuant to Title 15–16–23 of the Code of Alabama which provides as follows:

"§ 15–16–23. Suspending execution of death sentence of insane convict; order upon restoration to sanity; limitations on jurisdiction to suspend execution.

If after conviction and sentence to death, but at any time before the execution of the sentence, it is made to appear to the satisfaction of the trial court that the convict is then insane, such trial court shall forthwith enter an order in the trial court suspending the execution of the sentence to the time fixed in the order; and, if it subsequently is made to appear to the court that such convict, the execution of the sentence of whom has thus been suspended, is restored to sanity, the trial court shall forthwith have another order entered ordering and commanding the execution of the judgment and sentence originally awarded in said court at a time fixed in such order. This mode of suspending the execution of sentence after conviction on account of the insanity of the convict shall be exclusive and final and shall not be reviewed or revised by or renewed before any other court or judge. No court or judge in this state shall have the power or right to suspend the execution of sentence of any other court of record on account of the insanity of the convict. This section shall not prevent the judge or court from impaneling a jury to try the question of insanity or from examining such witnesses as he may deem proper for guidance."

While the present Petition was not filed pursuant to Rule 32, Alabama Rules of Criminal Procedure, the Court made it clear from the outset that the Court will construe the Petition to be filed pursuant to Rule 32, Alabama Rules of Criminal Procedure to the extent, if any, necessary to invoke the juris-

---

2. The Court freely admitted into evidence affidavits, medical records, and other written evidence. There was no jury present, and the Court did not deem it appropriate to bar evidence on technical legal grounds.

3. Mr. Weeks' conviction and sentence were affirmed on direct appeal, and the United States Supreme Court denied certiorari. *Weeks v. State,* 456, So.2d 395 (Ala.Cr.App.1983), *aff'd,* 456 So.2d 404 (Ala.1984), *cert. denied,* 471 U.S. 1030 [105 S.Ct. 2051, 85 L.Ed.2d 324] (1985).

4. Defendant, through counsel, complains bitterly that the courts reviewing this case have "ignored" the incompetency of the defendant at earlier stages of the proceedings and have "ignored" alleged incompetency of trial counsel. Some of the evidence submitted by defendant appeared to relate to these matters, with which the courts have already dealt. Nevertheless, some of the evidence of the defendant's mental condition at earlier points in time was permitted, for whatever relevance it might have, to the defendant's current mental status.

diction of this Court to determine the issue of incompetency to be executed. The Court does not assume Rule 32 jurisdiction as to any other issues, and the Petition does not invoke the jurisdiction of the court as to any other issues.

In addition to the foregoing Alabama statute which mandates that a Defendant not be executed if he is "insane," the Supreme Court of the United States in *Ford v. Wainwright*, 477 U.S. 399 [106 S.Ct. 2595, 91 L.Ed.2d 335] (1986), has forbidden the execution of an incompetent person. This Court deems its jurisdiction to be fully invoked to determine incompetency for execution under both the above mentioned Alabama statute and the requirements of the United States Constitution.

In 1988, a Petition of *Coram Nobis* was filed, alleging, among other things, that the Defendant's mental condition was not given adequate consideration at the time of the trial; that the Defendant should have been found not guilty by reason of insanity; that the Defendant should have been found incompetent to stand trial and perhaps most importantly, that the mental status of the Defendant should have been raised as a mitigating circumstance at the sentence phase of the trial. The Petition also urged that defense counsel was incompetent in failing to adequately assert these matters. The Petition for Writ of Error Coram Nobis was denied, and its denial has been appropriately tested in all Courts of appropriate jurisdiction.[5] The Court is not now reviewing any issue pertaining to the Defendant's competency to stand trial, the Defendant's mental state at the time of the alleged offense, or the Defendant's mental status as a mitigating circumstance. The sole issue before the Court is incompetency to be executed.

*PSYCHOTROPIC MEDICATION:* The Petition makes allegations and seeks relief concerning the administration of psychotropic medication. The Defendant also filed a separate motion seeking an order barring the involuntary administration of psychotropic medicine. The evidence before the Court is undisputed that the Defendant has received no psychotropic medication since prior to February 1, 1995. There is also a distinct probability that although such medication was prescribed prior to that time, the Defendant has not taken any such medication for a period of approximately one year. He told expert witnesses that he had not taken the medicine, and the doctors apparently believed him. Dr. Lyman, a defense witness, agrees that medication is not a significant factor as to whether the Defendant is presently incompetent to be executed. The Court finds there to be no issue concerning involuntary administration of psychotropic medicine in this case.[6] As a precautionary measure, however, the defense motion is granted; and the Court ORDERS that the State of Alabama shall not administer psychotropic medication to the Defendant, unless specifically requested to do so by defendant and his lawyers.

*LEGAL ISSUE OF INCOMPETENCY TO BE EXECUTED:* The Anglo–American system of jurisprudence has long recognized the legal principle that an insane or incompetent person is not to be executed. Blackstone, in his Commentaries written well over 200 years ago, stated this rule:

> "Idiots and lunatics are not chargeable for their own acts, if committed when under

---

**5.** In the present Petition, defendant alleges "[w]hen Mr. Weeks attempted to introduce such mental health evidence in collateral attacks on his conviction in state and federal courts, those courts ignored, *see Weeks v. State,* 568 So.2d 864 (Ala.Cr.App.1989), *cert. denied,* 568 So.2d 864 (Ala.1990), *cert. denied,* 498 U.S. 882 [111 S.Ct. 230, 112 L.Ed.2d 184] (1990), or refused on procedural grounds to address the issue of whether his trial lawyer was constitutionally ineffective for failing to present this or any other mitigating evidence. *See Weeks v. Jones,* 26 F.3d 1030 (11th Cir.1994), *cert. denied,* — U.S. — [115 S.Ct. 1258, 131 L.Ed.2d 137] (Feb. 27, 1995). In short, because of technicalities in the

law, no jury or court, state or federal, has ever confronted the fundamental question of whether such a severely mentally ill defendant deserve the ultimate punishment of death."

**6.** *Cf. Perry v. Louisiana,* 498 U.S. 38 [111 S.Ct. 449, 112 L.Ed.2d 338] (1990); Keith Alan Byers, *Incompetency, Execution, and the Use of Antipsychotic Drugs,* 47 Ark.L.Rev. 361; Matthew S. Collins, *Involuntarily Medicating Condemned Incompetents for the Purpose of Rendering Them Sane and Thereby Subject to Execution,* 70 Wash. U.L.Q. 1229.

these incapacities; no, not even for treason itself. Also, if a man in his sound memory commits a capital offense, and. before arraignment for it, he becomes mad, he ought not to be arraigned for it because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried or how can he make his defense? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of nonsane memory, execution shall be stayed for peradventure, says the humanity of the English law, had the prisoner been of sound memory, he might have alleged something in stay of judgment or execution." *Ford,*

**7.** Most commentators criticize Blackstone's recounting of the rule on the narrow basis that Blackstone's stated rationale for the rule; i.e., that the defendant may have thought of some plea to stay the execution, seems inadequate. However, the commentators are overlooking the rhetorical quality of Blackstone's statement that links all these rules in one short paragraph. In essence, he is saying that an insane person cannot be tried, found guilty, sentenced, or executed. He does not suggest a different standard of incompetency for these four stages of trial.

**8.** See Generally: Robert F. Schopp, *Wake Up and Die Right: The Rationale, Standard, and Jurisprudential .Significance of. the Competency to Face Execution Requirement,* 51 La.L.Rev. 995.

**9.** If the rule is in fact closely related to the other stages of the proceedings that are mentioned, then Blackstone probably thought that the rationale was too clear to need explication. Many matters that we deal with at trial, such as mitigation, were then available only by clemency. Moreover, there were well over 200 capital offenses in Blackstone's day. Lawyers did not play nearly so prominent a role in the system then as they do now. Our system of law is founded on accountability. Insane persons are not accountable for their acts. The imposition of punishment presupposes free agency in choosing the wrong that is to be righted. Blackstone intimately connected the rules. The common law rule that forbade execution of incompetents is probably the farthest extension of the rule that accountability is not imposed upon insane persons. The Supreme Court has dealt with the issue as an Eighth Amendment issue, suggesting that execution of an incompetent person is "cruel and unusual." Commentators have suggested that it is no more cruel and unusual to execute an insane person than it is to. execute a sane person.

477 U.S. at 406–07 (*quoting 4 WILLIAM BLACKSTONE, COMMENTARIES 24–25.*[7]

In the present case, one of the more significant legal questions is the precise statement of the standard to be applied. Sometimes, understanding the reason for a rule—its rationale—assets in arriving at an understanding of the rule itself.[8] Numerous rationales have been advanced for the· rule that an incompetent should not be executed, and neither courts nor commentators are in agreement as to the precise reason for this rule.[9]

Regardless of the rationale for the rule, the rule existed at common law; it exists as a matter of statutory law in the State of Alabama; and it now exists as a matter of federal Constitutional law.[10] The net result

In fact, very rational arguments could be made to the contrary.

**10.** Although the academic community has not insisted on the point, the fact that in early Anglo–American jurisprudence, the events of the commission of the crime, the trial of the case, and the execution were not spread out over a long period of time is probably significant with regard to the present-day confusion about the standard to be applied. It is likely that a similar standard was originally applied in making all these determinations as the 11th Circuit has suggested. *Magwood v. Smith,* 791 F.2d 1438 (11th Cir. 1986), *cert. denied,* 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989). In the days before modern psychology and psychiatry, insanity was a generic term that could be applied to all these stages in a criminal trial. It is significant that at the time the common law rule emerged, knowledge of insanity was not at all developed. Some scholars suggest that psychology did not begin to establish itself as a separate science until Wilhelm Wundt established a laboratory for the study of conscious experience in 1879. The proliferation of diagnoses of mental disease and disorder as evidenced by DSM IV in modern times combined with the extended period of time which now elapses between the date of sentence and the date of execution now casts the issue of incompetence to be executed in a strange and different light. In view of these developments, it is difficult to still see that the rule probably initially related to free agency and accountability. A great deal of our jurisprudence is founded on free agency. The primary reason for awarding civil damages is for fault. In criminal matters, we require intent; and we excuse criminal offenses for which the defendant is not accountable. When capital cases are examined in this light, it makes little sense to apply capital punishment if the punishment does not address itself to

is that no clear standard now exists as to the circumstances that justify suspension of execution because of incompetency, and there is considerable variation among the States with regard to the standard to be applied.[11]

As legal scholar Keith Alan Byers points out, "[t]he only aspect of the issue addressed and resolved by the Supreme Court is the fact that the incompetent cannot be executed." [12] The Court in *Ford v. Wainwright* decided an incompetent cannot be executed, but did not articulate a standard to determine whether a person is competent to be executed.

Alabama law itself is not a model of clarity. The Alabama statute quoted above, pursuant to which the present petition is filed, provides that execution is to be suspended if the Defendant is "insane." Neither the Alabama Court of Criminal Appeals nor the Supreme Court of Alabama have interpreted the statute so as to give clear meaning to the word *insane* as used in the statute. As we will discuss in a subsequent portion of this Order, it is clear that in the common usage of the word, the Defendant in this case is "insane." What is not so clear is whether the word *insane* in the statute is used with its generic connotation, or whether it has specialized meaning in the law. The State in this case urges that the statute which would suspend the execution should be read *in pari materia* with the incompetency standard established

and eliminate the capacity to do evil. The presumption of free agency is deeply embedded in our law, and no doubt provides the rationale for imposing the burden of proof of incompetence on the person asserting it.

The justification of the death penalty must be embedded in the definition of the crime itself. Incompetency for execution appears to be an entirely different matter, based on different principles. The foundation of the law in free will and free moral agency contrast starkly with the belief systems of certain founders of psychological science such as Sigmund Freud, B.F. Skinner, and other leading psychologists who believed in determinism; i.e., that a person's behavior is a result of cause and effect over which the individual has no control.

11. One legal scholar accurately writes:

"Presently, the standards of competency for execution are diverse and vary from state to state. For example, the states of Kentucky and Alabama require the execution of an individual to be suspended if that individual is insane. At the same time, the state of Arkansas directs its governor to order the execution of a condemned individual found competent, but '[i]f the individual is found incompetent due to mental illness, the Governor shall order that appropriate mental health treatment be provided.' Similarly, Georgia forbids the execution of anyone who is 'mentally incompetent to be executed.' Twenty-five states require or allow the execution of a condemned prisoner to be suspended if that prisoner is either insane or something of an equivalent nature. Unfortunately, many statutes, like the one in Kentucky, do not specifically define what constitutes insanity.

"Other states, however, have attempted to define more specifically what constitutes insanity or incompetency. For instance, the states of Mississippi and North Carolina have expanded upon this basic insanity standard; thus they require that the condemned prisoner also have the capability to render assistance to his attorney when forming a defense to the imposition of the death sentence. Additionally, the state of Florida places emphasis on whether the convicted person has 'the mental capacity to understand the nature of the death penalty and why it was imposed on him,' whereas [f]our states employ a broad standard that the inmate must have sufficient intelligence to understand the nature of the proceedings against him, what he was tried for initially, the purpose of his punishment, and his impending fate; to know any facts which might make his punishment unjust or illegal; and to be able to convey that information to his attorney.

The state of Utah bases its standard on whether the condemned prisoner is 'suffering from a mental disease or defect resulting either in: (1) his inability to have a rational and factual understanding of the proceedings against him or of the punishment specified for the offense charged; or (2) his inability to consult with his counsel with a reasonable degree of rational understanding.' These various examples are representational of the spectrum of standards currently used within the United States to determine competency for execution.

"Despite the variations in the different states' definitions of competency for execution, all states do require that competency be established. Unfortunately, due to the Supreme Court's unwillingness to address this issue, variation will continue to exist in defining competency for execution. The only aspect of the issue addressed and resolved by the Supreme Court is the fact that the incompetent cannot be executed. Until the Court directly confronts the issue of defining competence for execution, no uniform standard will exist." (Citations Omitted). Keith Alan Byers, *Incompetency, Execution, and the Use of Anti–Psychotic Drugs*, 47 Ark.L.Rev. 361, 364.

12. Ibid.

in the Criminal Code. That standard requires that "at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense." § 13A–3–1, Code of Alabama. Thus, the State asserts that the defendant is competent to be executed if he was able to appreciate the nature and quality or wrongfulness of his act.

The defense, without waiving the possibility of a broader meaning of the word *insane* urges that the proper standard for the determination of the issue of incompetency to be executed is the following standard promulgated by the American Bar Association:

A. Convicts who have been sentenced to death should not be executed if they are currently mentally incompetent. If it is determined that the condemned convict is currently mentally incompetent, execution should be stayed.

B. A convict is incompetent, to be executed if, as a result of mental illness or mental retardation, the convict cannot understand the nature of the pending proceeding, what he or she was tried for, the reason for the punishment or the nature of the punishment. A convict is also incompetent if, as a result of mental illness or retardation, the convict lacks sufficient capacity to recognize or understand any fact which may exist which would make the punishment unjust or unlawful, or lacks the ability to convey such information to counsel or the court. *Standard 7.5–6, American Bar Association Criminal Justice Mental Health Standards.*

In *Magwood v. Smith,* 791 F.2d 1438 (11th Cir.1986), cert. denied, 493 U.S. 923, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989), the Eleventh Circuit Court of Appeals suggested that inquiries into an accused's competency to stand trial and a death row inmate's sanity at the time of execution are sufficiently analogous that the standards used to determine competency should provide any necessary instruction for purposes of the present hearing.[13] It is possible that *Magwood* is consistent with the State's contention and gives the defendant a more difficult standard than that proposed by the defendant.

While this Court finds the State's argument of statutory construction attractive, this Court adopts the standard proposed by defense counsel as promulgated by the American Bar Association for the following reasons:

1) An interpretation of the Alabama statute which limits itself to the statutory definition of mental disease or defect may not be sufficiently broad to address the United States Constitutional issue of incompetence for execution as recognized in *Ford v. Wainwright.* One reason for adoption of the standard proposed by the defense is a practical one. As will become clear in subsequent portions of this Order and opinion, the defense has the burden of establishing the incompetency of the Defendant to be executed. Even when the standard which defense counsel has proposed is applied, this Court concludes the defense has not met its burden. If the Defendant has not met his burden under his own proposed standard, then he certainly has not met the requirement which the State would have the Court adopt. Therefore, for the purpose of this case and for the purpose of ultimately bringing this case to a conclusion, it is quite practical to adopt the standard proposed by the Defendant.

2) A broader meaning of the word *insane* which includes the generic, non-technical use of the term, is not adequate and raises the anomalous possibility that the Defendant could be insane while at the same time meeting all the criteria of competence

---

**13.** This Court notes that in both instances, the standard might require the defendant to understand the nature of the proceeding. Considerably more competence might be required for a defendant to understand the complexities of a capital murder trial than to understand the nature of execution. Nevertheless, the analogy is a good one and is highly persuasive. Perhaps it is fair to say that the requirements for competence to stand trial set the outside parameters for incompetency to be executed. Certainly, it would make little sense to proceed with a capital trial if the defendant's mental condition at that time would prohibit execution.

for execution under the federal Constitution and the laws of our sister states. Thus, while the interpretation adopted by this Court expands somewhat on the legal definition of incompetency as set forth in the Alabama Criminal Code, it avoids the risk of being inadequate for federal Constitutional purposes. At the same time, the statutory definition of insanity constrains the Court not to adopt the expansive generic meaning of the term insanity. In *Magwood*, the 11th Circuit approved a standard consistent with the one now applied by this Court. This Court is certainly not imposing a more difficult standard for the Defendant than was approved by the *Magwood* court.

The Alabama statute which forbids execution of an insane defendant has been a part of Alabama law at least since 1907. With regard to the standard to be applied, it likely did nothing more than codify the common law. Its apparent purpose was not to impose a more stringent requirement on the death penalty but to limit the number of applications that a defendant can make for a stay of execution because of insanity. Suffice it to say the word *insane*, when it was incorporated into that statute, conveyed none of the modern medical understanding of incompetence.[14]

## PRESUMPTION OF SANITY AND THE DEFENDANT'S BURDEN OF PROOF:

It is a well-understood tenet of law that all persons are presumed to be competent.[15] The burden of proof of incompetency rests with the person asserting it. In this instance, counsel for the Defendant are asserting the Defendant's incompetency and they have the burden of proof. The burden of proof which this Court believes to be appropriate is proof to the reasonable satisfaction of the trier of fact, similar to the burden of proof in most civil cases. The burden of proof is alternatively stated as proof by a preponderance of the evidence. The gist of this burden of proof is that the Defendant must prove that, either at the present time or at the time of his proposed execution, it is more likely than not that he is or will be incompetent.[16]

## EVALUATION OF THE EVIDENCE:

After hearing all the evidence and hearing live testimony from most of the mental health experts, the Court finds a remarkable similarity in the experts' evaluations of the Defendant's mental condition. All of the experts are agreed, for instance, that the mental disorder of the Defendant is significant. Unquestionably, based on the best psychological and psychiatric evaluations available, the Defendant suffers from a serious mental disorder.[17] The problem for the Defendant

14. Dr. Scanlon, one of the witnesses in the hearing, gave some of the history of the development of modern knowledge of schizophrenia, paranoid type, and its distinction from bi-polar disorder—all of which occurred after the Alabama statute had been adopted.

15. See Title 15–16–2 *Code of Alabama:* "§ 15–16–2. Presumption of responsibility for acts; burden of proving irresponsibility. Every person over 14 years of age charged with crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury." Note the use of both the words "reasonable satisfaction" and the words "shall be clearly proved."

16. This Court is well aware of the fact that a cogent argument can be made that the Defendant should prove his incompetency by clear and convincing evidence. This is the burden of proof required of a defendant who is asserting that he/she is not guilty by reason of mental disease or defect. § 13A–3–1, Code of Alabama. Since the Court ultimately finds that the defendant has not met the burden of proof in this matter to the reasonable satisfaction of the Court, then *a fortiori* the Defendant has not established incompetency for execution by clear and convincing evidence. The Court rejects the notion that the Defendant has the burden only of injecting the issue of insanity, thereby imposing the burden on the State of proving the defendant is competent. Likewise, this Court rejects a burden of proof that would require that Defendant establish his incompetence beyond a reasonable doubt. Placing the burden of proof in this matter on the Defendant is consistent with the presumption that every person is legally responsible and accountable for his/her own acts.

17. Significantly, his diagnosis is precisely the same as that applied to defendant Magwood—paranoid/schizophrenia. Magwood was executed.

is that the existence of a serious mental disorder does not automatically translate into incompetence to be executed. Indeed, after careful consideration of all the evidence, this Court concludes that at the times that the Defendant was in the presence of the court—a period of 18 to 20 hours during the course of the two-day hearing—the Defendant in this case fully met the standards for competency to be executed as proposed by defense counsel. The Court saw the Defendant in person on April 7, 1995, and April 14, 1995. The undersigned Judge visited with the Defendant personally in order to gain insight into his mental condition.[18] The Defendant responded appropriately to questions that show he was aware of time and place; that he was aware of the nature of the current proceeding; that he understood both the identity and role of defense counsel; that he understood the role of the representatives of the State; that he understood the issue to be determined; that he understood the role of the judge; that he knew the date of his execution; that he understood that he would die as a result of execution—that his physical existence would come to an end. The Defendant appeared to fully understand that he was to be executed because he had been convicted of murder; he was able to name the deceased person; he remembered the approximate date of his trial and sentence and knew that he had been on death row ever since his trial and sentence. In short, there is nothing about execution or the current legal proceedings the Defendant ap-

peared to be unable to understand and appropriately articulate.[19] Evidence introduced by the State showed that in preparation for his pending death, the Defendant has given instructions to the warden concerning the disposition of his personal effects, which represents a strong degree of understanding of what is to happen. The defendant's long-term diagnosis is schizophrenia of a paranoid type. This diagnosis has been applied to the Defendant since 1974—long before the commission of the offense for which he is about to be executed. Defense spent a great deal of time developing and expounding upon the nature of this mental disease, but essentially everyone agrees that the Defendant is schizophrenic, paranoid type; that he suffers from delusions and occasional hallucinations; that the nature of his delusional system revolves around two centers—the first being religious and the second being racial/sexual.[20] Unquestionably, the average person on the street would regard the Defendant to be "insane," and the Defendant meets the dictionary generic definition of insanity.[21]

All of the experts agree that the Defendant has the ability to respond appropriately to the concrete and specific questions relating to the present moment and to correctly relate back to an interviewer what, for lack of a better term, the undersigned Judge will call a public or common understanding of such matters. The intriguing argument of defense counsel and of the experts who have testified on behalf of the Defendant is that the Defendant himself does not actually par-

18. The Defendant was not placed under oath. The conversation with the Defendant was not testimonial in nature. The Court simply engaged the Defendant in a one-on-one conversation to determine the extent of the Defendant's ability to understand and articulate his current legal status. The Defendant's words were verbal acts to be observed by the Court as finder of fact.

19. Expert testimony suggested that at some times in the past—but not a large percentage of the time—the Defendant may have been unable to understand and articulate the matters just recited.

20. There is no particular reason for this Judge to try to explain how race and sex are associated with each other in the Defendant's delusional pattern. Suffice it to say that the Court's own

interview with the Defendant bore out the association, and all of the experts tended to categorize the delusional pattern in this manner.

21. Defense counsel, out of an abundance of precaution, or perhaps for tactical reasons, introduced into evidence a large volume of documents and medical records that have little or no actual evidentiary value as to the current incompetency of the Defendant to be executed. While the records are extensive, the summary provided here is a totally adequate foundation for application of the legal standard. The actual wording of defense affidavits was produced, at least in some instances, by defense counsel, who seemed to understandably present matters in the best light for their client. For instance, the general tenor of Dr. Thomas' affidavit is much more favorable to the Defendant than his actual testimony.

ticipate in an "understanding" of these matters in the same way that a "normal" person would.

The Defendant, through counsel and expert witnesses, urges that because of the Defendant's delusional pattern—centered on religion and race/sex—the Defendant's understanding of the matters required by the legal standard for competency to be executed as proposed by the Defendant are not met. They urge that the delusions actually cause the Defendant to "understand" these matters differently from others. This "different understanding" is not apparent in the way that the Defendant engages in conversation. The undersigned Judge believes and finds that the attempts by expert medical witnesses for the Defendant to look beyond the objective data; i.e., the Defendant's response to direct questions, is speculative. Previously in this opinion, we have noted that the Defendant is schizophrenic, paranoid type and that he suffers from delusions. The Defendant asserts that he is God in various manifestations, such as God the Father, Jesus Christ, Allah. But the Defendant knows that when he is executed, his physical life will come to an end. He believes that he will then be transformed. It is precisely here that the expertise of medical experts breaks down. April 14, 1995—the final hearing date—was Good Friday; and there are millions of people who believe that death is merely a transformation as a result of what happened on Good Friday and the following Sunday morning. The Tibetan Book of the Dead outlines a formidable trip for the deceased through the Bardo world immediately after death. These are matters of religious belief, and there is a limit to human/scientific knowledge and expertise in these matters. Dr. Lyman, one of the experts for the Defendant responded, with appropriate humor, that while millions of others may feel that death is a beginning of life immortal, in Heaven most people "don't think they will be running the place." What the expert says may be true, but it is also true that what happens beyond death is beyond his expertise; and the Defendant and anyone else is free to believe what they wish about the hereafter. Likewise, the opinion expressed by experts—that the delusions associated with race evidence the Defendant's delusional understanding of the nature of his execution and death—will not stand close scrutiny. The majority of persons on death row, in fact, are Black; and there are many persons who correctly or incorrectly believe that racial persecution is associated with the death penalty. For the Defendant to make such an assertion, although this Court does not find such as assertion to be factually well-founded, is not so highly irregular and inappropriate as to cause his understanding of his pending execution to be attributable to delusion.

Dr. Lyman, a psychological expert who testified extensively for the Defendant, thought he saw a great deal of significance in the fact that the Defendant referred to a fellow inmate as his "lawyer." Dr. Lyman seemed to think that this reflected an inability on the part of the Defendant to properly utilize the services of his "real" lawyers. The Court questioned Dr. Lyman closely on the point, and there was no evidence of any material facts that the Defendant may have failed to transmit to his lawyers. Realistically, while the Court can understand Dr. Lyman's concern, the Court is well aware of the existence of "jailhouse lawyers." The undersigned Judge receives many, many petitions, motions, letters, and other documentation from inmates that have obviously been prepared by jailhouse lawyers. This is an every-day occurrence and carries not the slightest suggestion of incompetence. If anything, consultation with a jailhouse lawyer indicates a certain degree of clarity in the thinking of the Defendant. In this very limited instance, it is Dr. Lyman's understanding of "reality" that falls wide of the mark. There is no competent evidence from which this Court can conclude that the Defendant has been less than fully capable of assisting counsel.

The Defendant was in the presence of the undersigned Judge for a total of nearly twenty hours in the course of this hearing. The Court had the opportunity to observe the Defendant very carefully for the entire day on April 7, 1995, and the entire day on April 14, 1995—in addition to engaging the Defen-

dant in conversation. When called upon to come forward, the Defendant's behavior was a bit unusual. He brought unusual objects with him and walked in a somewhat strange manner. On the first day, he wore a band around his head with a domino on it that had black dots on a white background. It was a double-seven. The Defendant explained that the domino was him; i.e., *Weeks,* pointing out that there are seven days in a week. The second week when he came forward to have a conversation with the Judge, he brought with him a Bible, a Koran, and another book. He bowed to the Court Reporter and attempted to take a seat other than the one suggested by the Court. Perhaps these activities and others which the Court and counsel attempted to carefully document in the record, are significant in showing that the Defendant is indeed schizophrenic, paranoid type. However, at all other times, the Defendant sat quietly with counsel; he was attentive to the proceedings; he followed actions in the Courtroom with his eyes in a normal fashion. There was nothing about his behavior that was remarkable.[22] Indeed, at one point in the hearing, there was an exchange between counsel. The Defendant verbally objected to what the State's lawyer had said, asserting that he was using circumstantial evidence and that circumstantial evidence had been used to convict the Defendant. While it may have been inappropriate for the Defendant to "object," and while there was no technical legal merit to his "objection," the exchange provided significant insight. The Defendant understood what was going on; his argument made sense, although it was without legal

merit; he clearly understood that it was the State who convicted him and was now trying to bring about his execution; and he attempted to avoid that consequence by making an objection. All in all, the Defendant's behavior during eighteen to twenty hours in the Courtroom was unremarkable and less objectionable than that of many other criminal Defendants who have participated in court proceedings.[23]

After thoroughly sifting all the evidence, the Court finds that the most reliable indicia of the Defendant's incompetence lies in the way the Defendant responded to the Court's questions and the way he responded to direct questions by all of his interviewers, including his own medical experts. The Defendant understands that he is to be executed, why he is to be executed, the role of his lawyer and everything else that anyone else would understand about the matter. This is the case despite the fact that he suffers from a severe mental disorder. To veer away from his clear and lucid answers to these questions into the metaphysical arena of the nature of consciousness and the nature of reality, a description of what is normal, and other philosophical questions, seems to this Court to be inappropriate. Even in the realm of psychology there would be great room for disagreement as to the nature of "understanding" and of what is "normal." [24]

If indeed the Defendant's understanding of his current status, the nature of the present proceedings, the role of the persons involved in those proceedings, and the nature and reason for his pending execution, are all the products of a delusional pattern, the extent to which his delusional pattern coincides with

---

**22.** The Court observed and noted for the record approximately two instances in which by facial expression it appeared that the Defendant enjoyed the Court's admonishment of defense counsel, which occurred as a result of the attempt on the part of the Court to move the proceedings along.

**23.** The Court noted the paradoxical nature of the Defendant's clear and cogent understanding of the present proceedings. By demonstrating his clear and cogent understanding of the nature of the proceedings, etc., the Defendant brings about his own execution—which, if his I.Q. had not been tested in a range from 75 to 89, might be a more significant consideration.

**24.** After all, Dr. Thomas, contrary to all the other doctors, thought the Defendant suffered from bipolar disorder, which itself is a serious mental disorder. He also felt that if the Defendant were not receiving medication for schizophrenia, paranoid type, that he would quickly decompensate. Ironically, the Defendant was probably not taking the medication Dr. Thomas thought he was taking even at the time Dr. Thomas was making his assessment. There is no evidence to support the conclusion that the Defendant's condition has worsened a great deal since Dr. Thomas ceased to treat him.

reality is truly remarkable. Under the circumstances, the discovery of a delusional pattern and its products are quite mysterious, and can hardly form the basis for a predictable application of a rule that requires that a person be competent for execution. The open, apparent ability of the Defendant to respond cogently and appropriately to direct questions is a much more dependable guide to what the Defendant understands than is the vague and speculative suggestion of the experts.

*TIME FOR DETERMINATION OF INCOMPETENCY:* The Alabama statute would probably require no more than that the Court conduct a hearing to determine whether or not the Defendant is incompetent to be executed. Only if the Defendant were incompetent to be executed *at the time of the hearing* would the Court suspend execution. *Ford v. Wainwright,* however, probably requires that the Defendant be competent *at the time of his execution.* This Court, therefore, finds it appropriate to deal with the issue in both time frames. First, both on April 7, 1995, and April 14, 1995, when the Defendant was in the presence of the undersigned Judge, he was clearly competent to be executed. The second question—competency at the moment of execution—is a bit more difficult, and it might appear that the Court can answer that question only with the use of a crystal ball. However, the burden of proof as defined above is on the defense counsel; and they have not established to the reasonable satisfaction of the Court that the Defendant is likely to be incompetent for execution at the scheduled time for his execution. The law presumes that the Defendant will be competent at the time of his execution, and this presumption has not been overcome by the evidence presented in this matter.

Nevertheless, *Ford v. Wainwright* probably requires that the State not execute the Defendant on May 12, 1995, unless he is competent at that time. Accordingly, IT IS ORDERED that the officials of the State of Alabama in charge of the execution of the Defendant take steps to periodically review the mental status of the Defendant. This Court retains jurisdiction of this matter to the extent necessary to enter an Order staying execution if the officials in charge of the execution determine that the Defendant is not competent to be executed when the moment for execution arrives. Without limiting the generality of the foregoing, the State of Alabama is to cause the mental status of the Defendant to be carefully examined by competent mental health experts at least two days prior to the date of the scheduled execution and continuing up until the moment of execution. Lines of communication shall remain open at all time, and this Court is to be notified of any change in the mental condition of the Defendant which indicates that he is no longer competent to be executed. The standard to be used in making the determination as to whether he is incompetent to be executed is the standard proposed by the Defendant, promulgated by the American Bar Association:

A. Convicts who have been sentenced to death should not be executed if they are currently mentally incompetent. If it is determined that the condemned convict is currently mentally incompetent, execution should be stayed.

B. A convict is incompetent to be executed if, as a result of mental illness or mental retardation, the convict cannot understand the nature of the pending proceeding, what he or she was tried for, the reason for the punishment or the nature of the punishment. A convict is also incompetent if, as a result of mental illness or retardation, the convict lacks sufficient capacity to recognize or understand any fact which may exist which would make the punishment unjust or unlawful, or lacks the ability to convey such information to counsel or the court.

While the ultimate determination is a legal question for the Court, the standard is provided as a criterion for the State and its mental health professionals in making the necessary assessments up to the moment of execution.

It is therefore ORDERED, ADJUDGED AND DECREED that the Defendant's Petition for Relief from Sentence of Death on Grounds of Mental Incompetency to be Executed be and the same is hereby DENIED.

The execution is to proceed as scheduled, subject, however, to the terms and conditions hereinabove stated.

The Clerk of the Court is to mail a copy of this Order to counsel of record for the Defendant, the Office of the District Attorney, the Office of the Attorney General, the Office of the Governor of the State of Alabama, the Clerk of the Supreme Court of Alabama, and to the Department of Corrections.

SIGNED this 21st day of April, 1995.

/s/Dale Segrest
DALE SEGREST, Circuit Judge

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

Tomorrow morning Alabama plans to execute Varnall Weeks, a delusional paranoid schizophrenic whom two psychologists and one psychiatrist, one of whom was state appointed, found to be severely mentally ill and whom the state court acknowledged meets the general definition of insanity.[1] The majority resolves grave and complex legal issues in Weeks's case without oral argument, on less than full briefing, and after a minimal period of contemplation. Because I believe the Eighth Amendment's prohibition on executing the insane requires more than a cursory review, I would grant Weeks's requests for a certificate of probable cause and for a stay to allow for oral argument.

Under *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983) (citations omitted), a certificate of probable cause may be granted if a petitioner makes "a substantial showing of the denial of [a] federal right." A petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different matter]; or that the

questions are adequate to deserve encouragement to proceed further." *Id.* at 893 n. 4, 103 S.Ct. at 3394–95 n. 4 (citations omitted). If a certificate of probable cause is issued, "petitioner must then be afforded an opportunity to address the merits, and the court of appeals is obligated to decide the merits of the appeal." *Id.* at 893, 103 S.Ct. at 3395. If necessary to prevent mootness, a court of appeals should stay the execution pending resolution on the merits. *Id.* at 893–94, 103 S.Ct. at 3395.

In my view, Weeks has made the requisite showing as to his competency claim. In *Ford v. Wainwright*, 477 U.S. 399, 409–10, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986), the Supreme Court held that "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." The *Ford* majority, however, did not define insanity.[2] The state court judge in this case acknowledged that *Ford* "did not articulate a standard to determine whether a person is competent to be executed."

Since *Ford*, courts have adopted different legal definitions of Eighth Amendment mental competency for execution. *Compare Rector v. Clark*, 923 F.2d 570, 572 (8th Cir.) (examining "whether petitioner understands that he is to be punished by execution" and "whether petitioner understands why he is being punished"), *cert. denied*, 501 U.S. 1239, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991) *with Lowenfield v. Butler*, 843 F.2d 183, 187 (5th Cir.) (evaluating whether petitioner is "unaware that he is about to be put to death as a result of his earlier conviction and sentence for murder"), *cert. denied*, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 714 (1988) *and Martin v. Dugger*, 686 F.Supp. 1523, 1566–73 (S.D.Fla.1988) (holding that a "prisoner need only appreciate the connection between the crime and its punishment" in order to be executed), *aff'd on other grounds*, 891 F.2d 807 (11th Cir.1989). The Eleventh Circuit

---

1. Among other things, Weeks believes that he is God and that after his death, he will reign in heaven as a tortoise.

2. In his plurality opinion, Justice Marshall suggested that it "[i]s no less abhorrent today than it has been for centuries to exact in penance the life of one whose mental illness prevents him from comprehending the reasons for the penalty

or its implications." *Ford*, 477 U.S. at 417, 106 S.Ct. at 2606. Justice Powell, in his concurring opinion, stated that he "would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422, 106 S.Ct. at 2608 (Powell, J., concurring).

addresses this issue for the first time in this case. That we might do so without a thorough, reasoned determination of the meaning of insanity under the Eighth Amendment is particularly troubling.[3]

The rule against executing the insane has roots in the common law. Legal writers like Coke recognized that "the execution of . . . a mad man . . . should be a miserable spectacle, both against Law, and of extreme inhumanity and cruelty, and can be no example to others." 3 E. Coke, Institutes 6. Without oral argument, we cannot be sure to avoid such a miserable spectacle in this case. Accordingly, I dissent.[4]

---

**3.** We are confronted with another issue of first impression regarding the deference we owe to the state court's determination that Weeks is competent to be executed. Because of our conflicting circuit precedent on similar issues, I also would grant oral argument regarding the deference to be given to the trial court's competency determination. *See United States v. Hogan*, 986 F.2d 1364 (11th Cir.1993).

**4.** I concur in the determination of the majority that Weeks's claims other than the competency issue are properly denied.